# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

### No. ACM 40110

_____

### UNITED STATES
*Appellee*

**v.**

### Antoine M. TARNOWSKI
Senior Airman (E-4), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 4 November 2022

_____

*Military Judge:* Shad R. Kidd.

*Sentence:* Sentence adjudged on 28 January 2021 by GCM convened at Buckley Air Force Base, Colorado. Sentence entered by military judge on 24 February 2021: Bad-conduct discharge, confinement for 18 months, forfeiture of all pay and allowances, and reduction to the grade of E-1.

*For Appellant:* Major Alexandra K. Fleszar, USAF.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Jay S. Peer, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court, in which Judge ANNEXSTAD and Judge GRUEN joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

KEY, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification each of simple assault and

drunk and disorderly conduct in violation of Articles 128 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 928, 934.[1] Pursuant to his guilty plea, Appellant was convicted of one specification of unlawfully carrying a concealed weapon on divers occasions in violation of Article 114, UCMJ, 10 U.S.C. § 914.[2] The members sentenced Appellant to a bad-conduct discharge, confinement for 18 months, forfeiture of all pay and allowances, and reduction to the grade of E-1.

Appellant raises seven issues on appeal: (1) whether the military judge erred by neither releasing Appellant from pretrial confinement nor granting him additional credit due to conditions of that confinement; (2) whether the military judge erred by admitting testimony under the excited utterance hearsay exception; (3) whether trial counsel made improper findings and sentencing arguments; (4) whether trial counsel's reading of the victim's unsworn statement amounted to plain error; (5) whether the military judge's instruction on a lesser included offense was erroneous; (6) whether Appellant's sentence is inappropriately severe; and (7) whether, in light of *Ramos v. Louisiana*, ___ U.S. ___, 140 S. Ct. 1390 (2020), the military judge was required to instruct the court members that a guilty verdict must be unanimous.[3] We have carefully considered issue (7) and find it does not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

### A. Appellant's Nonjudicial Punishment

In late 2019, Appellant was under investigation for mishandling a firearm while intoxicated as well as being drunk and disorderly—an episode which culminated in Appellant passing out in his front yard with his pants down, genitals exposed—conduct allegedly committed between February and July of 2019. During this investigation, allegations arose that Appellant had sexually assaulted a woman. In December 2019—while the sexual assault allegations were being investigated—Appellant's commander, Lieutenant Colonel (Lt Col)

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ, Military Rules of Evidence, and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant admitted that his carrying of the concealed weapons was unlawful, as he violated a Colorado statute prohibiting the carrying of firearms while intoxicated.

[3] Except for issues (3) and (7), Appellant personally raises each issue pursuant to *United States v. Grostefon*, 12 M.J. 431, 435 (C.M.A. 1982).

JM, offered Appellant nonjudicial punishment under Article 15, UCMJ, 10 U.S.C. § 815, for the firearm and drunk and disorderly offenses. Appellant agreed to these proceedings, and Lt Col JM subsequently imposed punishment consisting of forfeitures, a reprimand, and a suspended reduction in grade from E-5 to E-4.

## B. Assault and Inpatient Treatment

On 15 February 2020, JC—an Airman in Appellant's unit—reported to his leadership that he was at a dinner party earlier in the evening. The host of the party, Staff Sergeant (SSgt) TN, was also in the same unit. Although SSgt TN's wife was not at the house during the party, his three-year-old daughter was. The other attendees included another co-worker along with that co-worker's wife, sister, and young daughter.

Appellant had also been invited, and he arrived—already intoxicated—via a ridesharing service. He continued to drink at the party from a bottle of vodka he had brought with him while SSgt TN prepared dinner. No one else at the party was drinking. After some time passed, Appellant went outside and sat on the front porch. A short while later, JC went outside to talk to Appellant, and Appellant started "venting" about being under investigation for sexual assault. Appellant then began talking about how much he disliked their commander and how he told the commander during a meeting, "You're what[']s wrong with the f[**]king military." JC gave Appellant a cigarette, which Appellant had difficulty lighting.

According to the statement JC gave to military investigators, Appellant "all of the sudden [ ] sat up and started glaring at him . . . for a few moments and [Appellant] looked like he was trying to undo his pants." Appellant told JC, "Say what you want to f[**]king say" and then pulled a loaded pistol from inside his waistband and pointed it at JC. Fearing for his life, JC slapped the gun out of Appellant's hand and retrieved the dropped firearm before Appellant could. JC removed the magazine as well as the round in the gun's chamber and started walking back towards the front door to the house. Appellant put his hand on JC's chest and said, "give it f[**]king back." Afraid Appellant had a knife or otherwise intended to harm him, JC gave the empty gun back to Appellant. JC kept the magazine and the additional round and went into the house.

The following day, Lt Col JM ordered Appellant to undergo a mental health evaluation, and Appellant was voluntarily admitted later that same day to Denver Springs for inpatient treatment for alcoholism and addiction. On 19 February 2020—three days after Appellant was admitted—Lt Col JM provided Appellant notice that he intended to vacate the suspended reduction in grade from the earlier nonjudicial punishment based upon Appellant pointing the

firearm at JC as well as being drunk and disorderly at the time. Lt Col JM ultimately vacated the suspended punishment on 2 March 2020.

While Appellant was in treatment at Denver Springs, a civilian detective obtained a search warrant for Appellant's house to look for firearms and ammunition based upon JC's report in addition to a variety of other interactions the local police had had with Appellant. Parts of weapons and ammunition were found in Appellant's house, but the authorities did not locate any functioning firearms. During the search, however, a neighbor approached some of the agents standing outside and explained he had Appellant's firearms.[4] The neighbor subsequently turned over approximately 12 firearms, including the pistol Appellant had pointed at JC.

## C. Pretrial Confinement

Appellant was released from Denver Springs on 23 March 2020 and ordered directly into pretrial confinement by Lt Col JM. Pursuant to this order, Appellant was placed into confinement at the Douglas County Detention Facility ("Douglas County") in Castle Rock, Colorado. Two days later, a social worker at Denver Springs signed a six-line memorandum which states Appellant had received treatment there, was an active participant, was the leader of a cohort, supported other members in the program, followed all the rules, and was respectful of the staff. The memorandum also states, "At the time of discharge, the treatment team does not believe that [Appellant] is a threat to himself or the community."

According to a "discharge medication summary" he received from Denver Springs, Appellant had active prescriptions for ten medications. That facility's personnel had also annotated Alcoholics Anonymous and individual therapy as "continued treatment needs" on the discharge plan they gave Appellant. Shortly after his arrival at Douglas County, Appellant filed a formal complaint based upon his assertion he was not receiving all of his prescribed medications. Douglas County staff responded that they would not dispense some of those medications to Appellant based on their policy of not providing narcotics to confinees.

A pretrial confinement reviewing officer, Lt Col MS, reviewed Lt Col JM's order. She considered JC's allegations, along with the 2019 nonjudicial punishment and subsequent vacation of the suspended portion of the punishment. She also considered nonjudicial punishment Appellant received in 2017 for breaching the peace by "wrongfully shouting and destroying furniture in an

---

[4] Investigators later determined Appellant had asked the neighbor to retrieve the firearms from Appellant's house for safekeeping after beginning his inpatient treatment at Denver Springs.

apartment complex" while intoxicated, in addition to the fact that a portion of that punishment was later set aside. The Government presented a statement from Appellant's former roommate, dated 13 July 2019, who said Appellant would drink daily and that when Appellant was drunk, he would become belligerent and threatening, to include pointing a firearm at her face on one occasion. She also described Appellant shooting a shotgun in his suburban backyard while intoxicated, making statements such as how it would be easy to "snap necks" or make someone "disappear," and threatening and harassing her after she moved out. According to other documents provided to Lt Col MS, Appellant's former roommate eventually obtained a protective order against Appellant. A statement from Appellant's first sergeant was also offered in which the first sergeant recounted the initial notification of the civilian authorities. According to the statement, the police officers told the first sergeant they would not attempt to enter Appellant's residence to look for him "because the risk for their safety was too great" due to their prior experiences with Appellant and "his hatred towards law enforcement."

Lt Col JM testified at the hearing that he ordered Appellant into pretrial confinement based on his concerns for Appellant's safety and the safety of the public. He expressed apprehension that Appellant might have access to other firearms and that lesser means of restraint would not prevent Appellant from obtaining and abusing alcohol, especially in light of the fact that prior disciplinary actions had not prevented Appellant's misconduct. An Air Force Office of Special Investigations (AFOSI) special agent also testified about her office's investigation into another episode in which Appellant was drunk at a restaurant while carrying a concealed weapon, a violation of Colorado law. JC testified as well, telling Lt Col MS that the experience was traumatic, that he was receiving mental health care as a result, and that he was afraid Appellant would seek revenge if released from confinement.

At the hearing, Appellant's counsel submitted the memorandum from Denver Springs and a memorandum from the Douglas County Sheriff's Office explaining the risk-mitigation measures in place at the confinement facility as a result of the coronavirus (COVID-19) spread. One of these measures involved the cessation of a number of programs, to include Alcoholics Anonymous meetings. Appellant also submitted a statement in which he explained how beneficial the Denver Springs program had been for him, but that he was not able to participate in any rehabilitation programs at Douglas County. He also noted that he was not receiving all the medications he had been prescribed, but he did not specify which medications were at issue or how this was impacting him. Appellant added that all of his firearms had been seized by the police and that he had no intention of buying additional ones.

Lt Col MS concluded Appellant should remain in confinement, determining Appellant would engage in serious criminal misconduct if not confined, due to his "lengthy history of alcohol-related criminal behavior" and "the minimal impact, if any, discipline has had upon [Appellant's] predilection toward mishandling firearms while inebriated." She also concluded that lesser forms of restraint were inadequate as "there is no way to ensure that [Appellant] does not have access to firearms or alcohol."

## D. Appellant's Motion Related to his Pretrial Confinement

In April 2020, Lt Col JM preferred six specifications against Appellant: two specifications of sexual assault (both arising from a single episode), unlawful carrying of a concealed weapon on divers occasions, obstruction of justice (by causing the movement of his firearms), assaulting JC by pointing a loaded firearm at him, and being drunk and disorderly when pointing the firearm. The last two of these specifications addressed the same conduct upon which Lt Col JM had based his decision to vacate Appellant's suspended nonjudicial punishment. After a preliminary hearing conducted pursuant to Article 32, UCMJ, 10 U.S.C. § 832, the obstruction of justice specification was dismissed.

Meanwhile, Appellant—through his counsel—continued to seek assistance in obtaining access to the prescribed medications Douglas County was withholding from him. In response, trial counsel produced a memorandum from a staff psychiatrist at Buckley Air Force Base who had determined Appellant did not need two medications prescribed to aid Appellant in sleeping—Trazodone and Doxepin—as they were considered to be "comfort medications." The psychiatrist further noted, "the medical professionals at Douglas County Jail also informed me that it is standard practice for confinement facilities to not allow narcotics in their facilities and I agree."[5] Appellant was transferred from Douglas County to the confinement facility at F.E. Warren Air Force Base, Wyoming, in early June 2020. One impetus for the transfer was Appellant's complaints about his medications, and once Appellant was in the military facility, he was allowed to obtain all his prescribed medications.

On 7 December 2020, Appellant submitted a motion to the military judge asking that he be awarded additional credit for the confinement he served at Douglas County as well as to be released from pretrial confinement. The military judge heard evidence and argument on the motion when Appellant was arraigned on 17 December 2020. Trial defense counsel argued Appellant had been subjected to illegal pretrial punishment based upon the denial of his med-

---

[5] Appellant was also not receiving a third anxiety-related medication, but the psychiatrist concluded Appellant was receiving a different medication for that disorder.

ications and his inability to participate in either Alcoholics Anonymous or therapy while he was at Douglas County. The Defense further argued the pretrial confinement reviewing officer had abused her discretion in ordering Appellant to remain confined in the first place because—according to the Defense—there was inadequate evidence indicating Appellant was likely to commit further misconduct. On this latter point, the Defense focused on the fact Appellant's firearms had been seized and his successful completion of treatment at Denver Springs.

In rebuttal to these claims, the Government submitted transcripts of some of Appellant's phone calls from Douglas County with his mother in which Appellant occasionally complained about not receiving his medications, although he also mentioned that even though he had trouble falling asleep at night, he was sleeping for a good portion of the days.[6] During one call, Appellant told his mother that the Government was seeking to have him moved to the confinement facility at F.E. Warren Air Force Base so that he could receive his medications, but that he preferred to stay at Douglas County since he would be required to wear his uniform at the military facility and would be allowed less telephone time. "I'd rather f[**]king be here," he told her.

Appellant also talked about his unit leadership shortly after the pretrial confinement reviewing officer determined he should remain confined, telling his mother,

> I'm sick of my f[**]king commander and shirt coming here just to pretend to give a f[**]k. And sit there and oh, is there anything we can do? I'm like, get the f[**]k out of here. . . . I'm going to ask them to stop f[**]king visiting me. . . . They're the f[**]king reason I'm in here. One hundred percent. You could be like all right, yeah, let's let him out, and then I'm not in here. So why the f[**]k would you even show up just to be a d[**]k about it?

As for JC, the Airman whom Appellant threatened with the firearm, Appellant said on the same call,

> Like the f[**]king—the p[**]sy that this happened to, like the alleged offenses happened to, f[**]king made a statement of, "Oh, I'm living my life in fear forever. The only way I'll be able to cope with life is knowing that he's in jail, because if I knew he was out, I'd be worried for my life at any moment, at all times." . . . It was like you piece of f[**]king s[**]t p[**]sy b[**]ch. . . .

---

[6] At the start of each call an automated message told the parties on the line that the call was "subject to recording and monitoring."

> Like, it's not even f[**]king serious. You didn't even get hurt at
> all. . . . So that p[**]sed me the f[**]k off.

The Government also submitted a memorandum from the F.E. Warren confinement facility which explained, *inter alia*, that Appellant had never asked to participate in Alcoholics Anonymous and that, although Appellant was offered mental health care, he said his trial defense counsel had advised him not to speak to the mental health providers. In response to Appellant's motion, trial counsel argued that the opinion of the Denver Springs staff was not determinative on the question of whether Appellant would commit further misconduct because Appellant had no access to alcohol during his treatment there, so the staff was not well equipped to understand how Appellant would act should he relapse.

The military judge concluded the pretrial confinement reviewing officer had not abused her discretion in continuing Appellant's pretrial confinement due to Appellant's history of alcohol abuse, mishandling of firearms, and violent behavior, the most recent episode of which occurred while Appellant was under investigation for sexual assault. The military judge also determined that it was reasonable for the reviewing officer to conclude lesser forms of restraint would not be effective because other forms of moral restraint, such as the threat of having his suspended punishment vacated, were insufficient to prevent Appellant from engaging in misconduct. With respect to Appellant's inability to obtain all his medications, the military judge found Appellant had failed to assert this caused him any negative effects, health or otherwise, and that Appellant told his mother he was sleeping during the day. Thus, the military judge found no violation of Article 13, UCMJ, 10 U.S.C. § 813. Noting that Rule for Courts-Martial (R.C.M.) 305(k) seemed to have a lower bar ("unusually harsh circumstances"), the military judge concluded Appellant's pretrial confinement had not met that standard, either, and he declined to order Appellant's release.

Three days before Appellant's court-martial resumed on 25 January 2021, the convening authority withdrew the charge with the two specifications alleging sexual assault, leaving Appellant charged with unlawfully carrying a firearm on divers occasions, committing aggravated assault on JC, and being drunk and disorderly on the same day as the aggravated assault. During his providence inquiry for the firearm specification, Appellant admitted to carrying a firearm while intoxicated on two occasions: when he went to the restaurant and the night he assaulted JC.

## II. DISCUSSION

### A. Appellant's Pretrial Confinement

On appeal, Appellant asserts the military judge erred by not releasing him from pretrial confinement and for not awarding him additional credit for his pretrial confinement conditions at Douglas County. As a remedy, he asks us to set aside his punitive discharge. We conclude the military judge did not err on either count, and we decline to grant any remedy.

#### 1. Law

Article 13, UCMJ, prohibits the pretrial punishment of an accused who is awaiting trial, as well as the imposition of confinement conditions "more rigorous than necessary to secure [an accused's] presence for trial." *United States v. Palmiter*, 20 M.J. 90, 93 (C.M.A. 1985). A military judge may also grant credit for pretrial confinement that involves "unusually harsh circumstances," under R.C.M. 305(k).

Whether an appellant is entitled to sentence relief due to a violation of Article 13, UCMJ, is a mixed question of law and fact. *See United States v. Savoy*, 65 M.J. 854, 858 (A.F. Ct. Crim. App. 2007) (citing *United States v. McCarthy*, 47 M.J. 162, 165 (C.A.A.F. 1997)). The burden of establishing entitlement to such relief is on the appellant. *See United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002) (citation omitted). We will not overturn a military judge's findings of fact, including a finding regarding intent to punish, unless those findings are clearly erroneous. *Id.* (citing *United States v. Smith*, 53 M.J. 168, 170 (C.A.A.F. 2000)). Whether Appellant is entitled to relief for a violation of Article 13, UCMJ, is reviewed de novo. *Id.*

Article 13, UCMJ, prohibits: (1) pretrial punishment, and (2) unduly rigorous pretrial confinement conditions. *United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005). Under the first prohibition, we examine the intent of the confinement officials and the purposes of the restrictions or conditions at issue. *Id.* (citations omitted). Under the second, we consider whether the conditions were "sufficiently egregious [to] give rise to a permissive inference that an accused is being punished, or the conditions . . . [were] so excessive as to constitute punishment." *Id.* at 227–28 (citations omitted). In the face of Article 13, UCMJ, violations, we have discretion to provide relief in the form of disapproving a punitive discharge. *See United States v. Zarbatany*, 70 M.J. 169, 175 (C.A.A.F. 2011).

#### 2. Analysis

On appeal, Appellant points to several aspects of his pretrial confinement which he argues warrant relief. First, he argues "no reviewing official . . . ap-

propriately factored [Appellant's] treatment [at Denver Springs] into their considerations" regarding whether or not Appellant should be confined. Second, Appellant argues he was "deprived of certain prescribed medications" while at Douglas County. Third, Appellant was unable to either obtain individualized therapy or participate in Alcoholics Anonymous.

Appellant's claims fail for a number of reasons. Regarding his first claim, Appellant argues that he had never received adequate treatment for his alcoholism until he was treated at Denver Springs. His theory seems to be that once he received that treatment, pretrial confinement was no longer warranted because he would not drink—and if he was not drinking, then he would not engage in any further misconduct. The only factual basis Appellant has offered on this point is the six-line memorandum from the Denver Springs social worker noting the treatment team's assessment that Appellant was not a threat to himself or the community at the time of discharge. The memorandum makes no reference to Appellant's assault on JC or his past misconduct, nor does it reflect an opinion as to whether Appellant was likely to commit further misconduct. Appellant has offered no evidence his treatment team was aware of the scope of his misconduct or the allegations against him, much less the evidence investigators had amassed in their months-long investigation. Appellant similarly offered no evidence to support his contention that he would not consume alcohol once released from treatment nor did he assert he was not at risk of relapse.

Although Appellant does not precisely delineate his legal theory on this point, we assume he is alleging the military judge and the pretrial confinement reviewing officer abused their discretion in determining continued pretrial confinement was warranted. Under R.C.M. 305(j), a military judge may review the pretrial confinement reviewing officer's determination and "shall order release from pretrial confinement only if" that officer's decision was an abuse of discretion, *and* "there is not sufficient information presented to the military judge justifying continuation of pretrial confinement" under R.C.M. 305(h)(2)(B). Pretrial confinement is permitted upon a belief "upon probable cause, that is, upon reasonable grounds" that: an offense triable by court-martial was committed by the confinee; it is foreseeable that the confinee will engage in serious criminal misconduct; and less severe forms of restraint are inadequate. R.C.M. 305(h)(2)(B). The provision further clarifies that "serious criminal misconduct" includes, *inter alia*, conduct "pos[ing] a serious threat to the safety of the community or to the effectiveness, morale, discipline, readiness, or safety of the command." *Id.*

Here, the pretrial confinement reviewing officer was presented with evidence of Appellant's past history of violence and alcohol abuse, culminating in Appellant drunkenly pulling a loaded pistol on one of his co-workers in the

close vicinity of other co-workers and their family members, to include two small children. The reviewing officer referred to the Denver Springs memorandum in her report and included it as an attachment. She concluded, "Ultimately, I find no persuasive evidence that [Appellant's] treatment in [Denver Springs] has a significant rehabilitative effect to outweigh his lengthy history of alcohol and firearms abuse, which stretches back to 2017 and includes no fewer than six (6) occasions upon which [Appellant] mishandled firearms while inebriated." Thus, contrary to Appellant's claims, the reviewing officer *did* consider Appellant's treatment and the Denver Springs staff's perspective, but simply did not give those matters the weight Appellant thinks she should have.[7] This is not a case of abuse of discretion, but rather a difference of opinion. Based upon our review of the evidence, the reviewing officer's decision was well-grounded in the evidence before her, and we agree the single statement in the Denver Springs memorandum does not necessarily offset Appellant's history of egregious misconduct.

The military judge's decision not to release Appellant has even more support in the record, as the military judge had new information available—namely Appellant's prison phone calls. In those calls, Appellant demonstrated neither remorse for his conduct nor a commitment to lawful conduct. Instead, he unleashed an expletive-laden tirade against his leadership who had been taking the time to visit him, and profanely debased JC, the Airman Appellant had victimized. One could easily conclude that rather than having been completely rehabilitated during his Denver Springs treatment, Appellant was simply adept at conforming his conduct to expectations when needed. Even then, Appellant was aware his phone calls with his mother were subject to monitoring and recording, yet he was unable to control his anger when talking about JC, his commander, and his first sergeant. Thus, we conclude the military judge did not abuse his discretion in declining to release Appellant from pretrial confinement.

Appellant's second and third points, relating to his medications and his inability to participate in counseling and Alcoholics Anonymous, seem to be alleging violations of the Article 13, UCMJ, prohibitions against pretrial punishment and unduly rigorous conditions as well as the R.C.M. 305(k) prohibition of unusually harsh conditions. The military judge suggested there might be a difference between these two standards. Indeed, the United States Court of Appeals for the Armed Forces (CAAF) has concluded that Article 13, UCMJ,

---

[7] The military judge also considered the Denver Springs memorandum, noting in his ruling, "While participation in treatment is commendable, it was also very recent with no indication of how [Appellant] would act without the constant supervision and oversight he received while at Denver Springs."

and R.C.M. 305(k) offer independent bases for granting sentencing credit based upon pretrial confinement conditions. *See United States v. Adcock*, 65 M.J. 18, 24 (C.A.A.F. 2007). The CAAF, however, has not precisely indicated how these two standards diverge, save to explain that an R.C.M. 305(k) violation may be found when confinement officials fail to abide by regulatory requirements. *See, e.g.*, *United States v. Williams*, 68 M.J. 252, 257 (C.A.A.F. 2010) (finding that a failure to follow regulations related to a confinee's suicide-watch status warranted credit under R.C.M. 305(k), but not Article 13, UCMJ). We need not delineate the specific boundaries of these two standards here, because the evidence does not establish a violation under either one.

With regards to Appellant's medication, what little information there is in the record indicates that Appellant was denied certain sleep aids based upon Douglas County's general prohibition of providing narcotics to inmates. There is no evidence this policy was applied with any intent to punish Appellant, that it was applied indiscriminately, or that it contravened any laws or regulations. There is an inadequate basis in the record to conclude the denial of these medications rendered Appellant's pretrial detention equivalent to punishment. Instead, the record indicates that while Appellant may have had difficulty falling asleep at night, he was permitted to sleep during the daytime. Appellant has alleged no other impact to his health or his wellbeing. Moreover, when Appellant discovered he might be transferred to a military confinement facility where he would be provided the medications, Appellant told his mother he would rather stay at Douglas County in order to avoid having to wear a uniform and having his telephone time reduced. If Appellant prioritized those issues over receiving his medications, it is difficult to see how not having the medications amounted to a serious deprivation of any sort. Under these facts, Appellant's claim fails.

Similarly, Douglas County's termination of inmates' access to programs such as Alcoholics Anonymous was due to efforts to stem the tide of a global pandemic. Such termination was not targeted at Appellant, nor is there any indication military authorities elected to house him at Douglas County for the purpose of depriving him of access to the program or other therapy. Given the widespread impacts of the COVID-19 pandemic, it can hardly be argued that efforts to limit gatherings of inmates were arbitrary or otherwise an abuse of discretion. Although Appellant asserts on appeal that he did not have the opportunity to obtain individualized counseling, there is nothing in the record indicating Appellant ever sought such counseling, much less that Douglas County officials denied him the opportunity to obtain it out of some punitive intent. Notably, once Appellant was transferred to the military facility where he did have access to both Alcoholics Anonymous and counseling, Appellant never inquired about the former and affirmatively declined the latter, apparently on the advice of counsel. Appellant has not offered any indication that

the lack of access to Alcoholics Anonymous while he was at Douglas County had any negative impact on him—whether while he was there or since the date of his transfer—sharply undercutting his claim that the conditions of his confinement were so rigorous as to warrant relief. Based upon the record before us, we conclude Appellant is not entitled to additional credit under either Article 13, UCMJ, or R.C.M. 305(k).

## B. JC's Out of Court Statement

### 1. Additional Background

Appellant's assault specification alleged he pointed a loaded firearm "at or near" JC. When he testified, JC said that Appellant "pulled a gun" on him. JC later explained that Appellant pulled the firearm out from his waistband and "was lifting [it] towards me." When JC said that, trial counsel explained that JC had "moved his arm upwards and outwards, to gesture as if [Appellant] was pointing a weapon." JC added that the gun "was coming towards [him]" and was "headed towards [his] throat and [his] face." Although not entirely clear from JC's testimony, it seems that the gun was pointing in the vicinity of JC's shoulder when JC slapped the gun out of Appellant's hand.

After JC gave the gun back to Appellant and took the bullets inside the house, SSgt TN arranged for a rideshare company to take Appellant home. The rest of the people at the house sat down for dinner once Appellant was gone. JC testified, "I was just trying to calm down. I wanted to act normal. I wanted to talk. I couldn't stop shaking. Like I said, my adrenaline was just through the roof. . . . I couldn't really eat. I kind of [ ] felt like I wanted to be sick." Afterwards, JC drove to his dormitory room, accompanied by his other coworker from the party. Later in the evening, JC wrote out an initial statement regarding the assault. He testified that when doing so, he "couldn't stop shaking."

During the drive from the party to his room, JC called his immediate supervisor, Sergeant (Sgt) AE.[8] Sgt AE explained that he had seen JC "stressed" and "anxious" in the past, and at the time of the phone call he sounded "emotional" and was "talking fast" and did not sound like his "normal self." Trial counsel asked Sgt AE what JC told him, leading to a hearsay objection from trial defense counsel. The military judge overruled the Defense's objection, concluding the statements JC made to Sgt AE fell under the excited utterance hearsay exception. The military judge also said he had determined there was

---

[8] At some point after the incident, Sergeant AE was commissioned as an officer and was a second lieutenant when he testified at Appellant's court-martial. The record does not provide any further detail regarding his grade at the time of the incident.

no unfair prejudice to Appellant in admitting the evidence. Sgt AE then testified, "So [JC] called me and told me that [Appellant] had pulled a gun on him and pointed it at him, and that he took it away from him, basically."

**2. Law**

Military judges' decisions regarding the admissibility of evidence are reviewed for an abuse of discretion. *United States v. Norwood*, 81 M.J. 12, 17 (C.A.A.F. 2021) (citations omitted). A decision amounts to an abuse of discretion if a military judge's "findings of fact are clearly erroneous," a military judge's decision was "influenced by an erroneous view of the law," or the decision was "outside the range of choices reasonably arising from the applicable facts and the law." *Id*. (internal quotation marks omitted) (quoting *United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020)).

An out of court statement offered for the truth of the matter asserted in the statement by someone other than the declarant is hearsay and inadmissible unless otherwise provided by the Military Rules of Evidence. Mil. R. Evid. 801(c), 802. The so-called "excited utterance" exception permits the admission of such hearsay statements if they "relat[e] to a startling event or condition" and are "made while the declarant was under the stress of excitement that [the event or condition] caused." Mil. R. Evid. 803(2). In determining whether the declarant was under such stress, we consider the totality of the circumstances, which include the declarant's mental and physical condition and the amount of time between the event and the statement. *United States v. Henry*, 81 M.J. 91, 96 (C.A.A.F. 2021). The "implicit premise underlying the excited utterance exception is that a person who reacts to a startling event or condition while under the stress of excitement caused thereby will speak truthfully because of the lack of opportunity to fabricate." *United States v. Donaldson*, 58 M.J. 477, 483 (C.A.A.F. 2003) (internal quotation marks omitted) (quoting *United States v. Jones*, 30 M.J. 127, 129 (C.M.A. 1990)).

**3. Analysis**

Appellant argues the military judge abused his discretion by admitting Sgt AE's testimony as to what JC told him because too much time had passed between the assault and JC's phone call. Appellant secondarily argues Sgt AE's testimony was cumulative and served solely to bolster JC's testimony. Appellant, however, concedes the Defense did not impeach JC's testimony with respect to Appellant pulling out the gun and lifting it towards JC's head.

The military judge did not abuse his discretion. JC testified about the stress he was under both during dinner—that is, before his call to Sgt AE—and when he was writing his statement after the call. From the record, it appears JC spoke with Sgt AE within two hours of the assault, and Sgt AE testified that he could tell JC did not sound like his normal self, based on his familiarity with

14

how JC behaves during stressful situations. Appellant does not point to any indication JC was no longer under the stress of the excitement caused by the assault other than that some time had passed. This sole factor is inadequate to counter the totality of the circumstances which strongly demonstrates JC was still under that stress when he recounted the assault to Sgt AE. Therefore, we conclude the military judge did not abuse his discretion by determining JC's statement to Sgt AE fell within the excited utterance hearsay exception.

We further conclude the military judge did not abuse his discretion in not excluding the evidence based upon Mil. R. Evid. 403 considerations. Appellant concedes Sgt AE's recollection of JC's statement was virtually identical to JC's unimpeached testimony. At the very most, Sgt AE's statement was cumulative to JC's testimony. While Mil. R. Evid. 403 simply permits a military judge to exclude otherwise admissible but cumulative evidence, the rule does not *require* the blanket exclusion of such evidence. Given the uncontested nature of the evidence, in addition to its brevity, we reject Appellant's secondary theory regarding this issue.

## C. Trial Counsel Argument

Appellant alleges trial counsel made a number of improper arguments during both the Government's findings and sentencing arguments—all without objection from the trial defense team—and he asks us to set aside his bad-conduct discharge as a remedy. We do not find the arguments to be improper, and we decline to grant Appellant's requested relief.

### 1. Law

We review claims of prosecutorial misconduct and improper argument de novo; when no objection is made at trial, the error is forfeited, and we review for plain error. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). Under the plain error standard, such error occurs "when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted).

"A prosecutor proffers an improper argument amounting to prosecutorial misconduct when the argument 'oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) (quoting *Fletcher*, 62 M.J. at 178) (additional citations omitted).

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel may strike hard but fair blows, but may not "inject . . . personal opinion into

the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted). "Golden Rule" arguments, in which the members are asked to "put themselves in the victim's place," are prohibited. *Baer*, 53 M.J. at 237.

In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *United States v. Gilley*, 56 M.J. 113, 121 (C.A.A.F. 2001). We do not "surgically carve out a portion of the argument with no regard to its context." *United States v. Baer*, 53 M.J. at 238 (internal quotation marks omitted).

When we find error with respect to the Government's findings argument, we assess for material prejudice and only reverse "when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Sewell*, 76 M.J. at 18 (citation omitted).

With respect to sentencing arguments, we must be confident an appellant "was sentenced on the basis of the evidence alone." *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (quoting *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013)). In assessing the impact of improper sentencing argument on an appellant's substantial rights in the absence of an objection, we ask whether the outcome would have been different without the error. *Norwood*, 81 M.J. at 19–20.

### 2. Additional Background and Analysis

#### a. Likening Appellant to a "Loose Cannon"

During his testimony, JC described being assaulted by Appellant:

> You know, he's talking. He's tell [sic] his stories. He's kind of teary-eyed. And then at one point, he leans back and he just starts like kind of glaring at me.
>
> . . . .
>
> And that's kind of when he said, you know, "Say what you want to f[**]king say." . . . And he's just making this eye contact with me with [his] teary, like just rage-filled eyes. And then, that's when he decided to pull the firearm on me.
>
> . . . .
>
> You know, it was just this kind of switch of anger at me. And I don't know what I did to direct that anger.

Trial counsel began the Government's opening statement by calling Appellant "a loose cannon with a short fuse." The trial counsel who gave the closing

argument returned to this theme, explaining that Appellant "drank alcohol, chose to carry his loaded firearm before he left the house, proceeded to a party, and then he blew up." At the end of the argument, he said, "That's the heart of the [G]overnment's case. The loose cannon with the short fuse." The phrase was mentioned once during the Government's sentencing argument when trial counsel said, "You have been firmly convinced that [Appellant] is a loose cannon. And now it's time to [rein in] that cannon, and we do that through punishment."

Appellant contends this "loose cannon" theme amounted to an *ad hominem* attack on Appellant. He likens his case to that of *Voorhees*, in which the CAAF found trial counsel's references to the accused as a "pig," "a pervert," and "a joke of an officer" to fall outside "the norms of fair comment." 79 M.J. at 14 n.7. We, however, perceive a wide gulf between trial counsel's argument here and the coarse disparagement at issue in *Voorhees*. In that case, trial counsel used highly derogatory terms to demean the accused. In Appellant's case, however, trial counsel employed the metaphor of a loose cannon with a short fuse to characterize Appellant's conduct. Given JC's description of Appellant's abrupt shift from simply talking to being intense and combative, trial counsel's metaphor was rather apt in as much as it portrayed Appellant as being likely to randomly create combustible situations and unexpectedly explode after only the slightest provocation. On appeal, Appellant attempts to characterize trial counsel's metaphor as a comment on Appellant's alcoholism and other mental health issues, but we see no indication trial counsel intended such commentary, and we will not read that nuance into trial counsel's straightforward theme.

### b. Asking the Members to Reflect on "Common Experience"

During the Government's findings argument, trial counsel argued JC's fear was reasonable based not just on his testimony that he feared for his life, but also that he could not eat dinner afterwards, could not "get his adrenaline to turn off," and that he was "numb" afterwards. Trial counsel told the members,

> And you know from your common experience you've ever had about anxiety, ever had any kind of panic, or if you've ever been confronted with something like, you know, see the red light in the rear view, hopefully not, but you have an adrenaline experience. It's hard for that turn off. [sic] This stuck with him. And he was still under that effect throughout dinner and reported it immediately. Which again, lends credibility to his report.

Appellant argues that by asking the members to reflect on their "common experience," that trial counsel was committing a "Golden Rule" violation under the theory that trial counsel essentially asked the members to put themselves

in JC's shoes. Context, of course, is key. At this point in the argument, trial counsel was arguing that JC had a reasonable apprehension of receiving immediate bodily harm, and that the post-assault physiological symptoms JC felt corroborated his testimony that he feared for his life when Appellant pulled his gun out. Being in a stressful situation is hardly an extraordinary experience, and we see nothing improper or legally erroneous with trial counsel asking the members to reflect on such a common phenomenon in their analysis of JC's credibility. *See, e.g.*, *Fletcher*, 62 M.J. at 183 (noting trial counsel may comment on common knowledge, which includes matters upon which people "in general have a common fund of experience and knowledge").

### c. Comments About the Seizure of Appellant's Weapons

Appellant points to other comments made by trial counsel during the Government's sentencing argument as amounting to error. We are not convinced.

The subject of the seizure of Appellant's firearms by law enforcement personnel was discussed in detail during Appellant's pretrial confinement hearing as well as in pretrial motions, but the members heard very little testimony about this. Essentially, the members learned that AFOSI special agents partnered with civilian law enforcement to search for the firearm with which Appellant assaulted JC. During testimony on that point, an AFOSI special agent explained Appellant's neighbor notified the agents that he had Appellant's firearms, and the agents then "coordinated to arrange picking up those firearms." The special agent testified that his understanding was that Appellant had asked his neighbor to safeguard his firearms to "keep anyone from stealing them" while Appellant was "away," and that the neighbor turned over the weapons because he did not want to be involved in the investigation. The agent also explained that the weapon used in the assault on JC was provided to AFOSI, but there was no testimony as to what, if anything, became of the other weapons.

As part of the Government's sentencing case, trial counsel called SSgt SW to testify about the first instance of Appellant unlawfully carrying a firearm. SSgt SW told the members that he was having dinner at a local restaurant with his wife and six-month-old daughter along with SSgt TN, his wife, and their daughter. Appellant had also been invited, and he showed up drunk and continued to drink once there, ultimately confronting diners at a nearby table by "aggressively" asking them, "Who the f[**]k are you looking at?" and telling them, "You don't know who the f[**]k I am." While SSgt SW and SSgt TN defused the situation with the other diners, Appellant began slouching in his seat and drooling. This led SSgt SW and SSgt TN to drag Appellant outside the restaurant. Appellant then began yelling profanities at passers-by until Appellant fell down, face-first. When that happened, Appellant's shirt came up and SSgt SW saw Appellant was armed with a pistol and a knife. SSgt SW took

both the weapons from Appellant and unloaded the firearm. At the time, SSgt SW's and SSgt TN's families were in the parking lot within sight of the disturbance, approximately 75 yards away.

During the Government's sentencing argument, Trial counsel recounted Appellant's conduct at the restaurant and then his assault on JC. Trial counsel said of the latter, "This incident resulted in a call to local law enforcement, and a seizure of [Appellant's] weapons, again." Before us, Appellant claims trial counsel suggested to the members that his firearms had been seized on more than one occasion, while law enforcement authorities only seized his firearms one time. What Appellant overlooks is that his weapons *were* seized on another occasion—namely the evening at the restaurant when SSgt SW took Appellant's gun and knife from him. Therefore, contrary to his argument on appeal, Appellant's weapons were seized more than once. The members heard about Appellant's weapons being taken away from him both by SSgt SW and JC, as well as being turned over to law enforcement by his neighbor. Appellant's argument on this point is without merit.

### d. Comments About Appellant's Unsworn Statement

In Appellant's unsworn statement, he told the members he was "sorry to have caused distress and suffering to anybody" and that he was "deeply remorseful for the pain that [he had] caused." Near the end of that statement, Appellant said, "I assure you, the Air Force, [JC], and my friends and family, that I will continue my journey of self-improvement and sobriety so that nothing like this court-martial ever happens again." Trial counsel argued Appellant, when delivering his unsworn statement, did not apologize to JC, saying to the members, "Did you hear [JC's] name? No, you didn't. The first thing out of his mouth should have been an apology to [JC]. But what does he do[ ]? He blames alcohol, and he blames [ ] his family issues."

Appellant takes issue with trial counsel's comments, arguing Appellant had, in fact, offered his apologies. However, once a convicted servicemember testifies or makes an unsworn statement and "either expressed no remorse or his expressions of remorse can be arguably construed as being shallow, artificial, or contrived," the sentencing authority may consider such with respect to that servicemember's rehabilitation potential, and trial counsel may comment on it in argument. *United States v. Edwards*, 35 M.J. 351, 355 (C.M.A. 1992). Here, trial counsel was partially correct—Appellant did not squarely apologize to JC; instead, Appellant promised to JC and others that he would remain sober and not re-offend. Trial counsel was incorrect when he claimed the members did not hear JC's name, as Appellant did refer to JC by name. In the end, Appellant's unsworn statement was subject to trial counsel's fair comment, and we do not see trial counsel's erroneous claim regarding JC's name as rising to the level of prosecutorial misconduct. We also have no reason to believe that

19

singular comment led Appellant to be sentenced on anything other than the evidence presented to the members.

### e. Comments About Appellant's "Profits"

Trial counsel argued at one point during sentencing, "The [G]overnment concedes that yes, a dishonorable discharge is harsh. But there's no other way for the Air Force to disassociate itself from [A]irmen the [sic] risk the lives of other [A]irmen. [Appellant] profited long from his actions; and he should not benefit from his actions." During the Defense's sentencing argument, trial defense counsel responded,

> [T]he [G]overnment mentioned that [Appellant] shouldn't be here to profit from his actions. That sitting in jail for the 311 days awaiting a trial date, of working on yourself, profiting from his actions? Well, he might be profiting from working on himself, but he certainly didn't get a benefit to doing any of this.

Like the Defense, we are somewhat puzzled by trial counsel's argument that Appellant "profited long from his actions." We are unclear if trial counsel misspoke or was making some metaphorical point which has eluded us, as no evidence was offered that Appellant received any benefit from his conduct, financially or otherwise. Without any such evidence, the comment is confusing, if not meaningless, and trial defense counsel adeptly pointed that out to the members. In any event, we easily conclude that whatever can be said of this statement, it did not persuade the members, as they rejected trial counsel's recommendation they sentence Appellant to a dishonorable discharge—a recommendation directly tied to the "profited long" comment. Thus, any error on this point warrants no relief.

Although not raised by Appellant, we pause to note our concern with trial counsel's comment that there was "no other way for the Air Force to disassociate itself from [A]irmen" who risk others' lives other than via a dishonorable discharge. To the extent trial counsel was arguing that the members should adjudge a dishonorable discharge for the sole purpose of removing Appellant from the military, such would be improper, as a punitive discharge is "not intended to be a vehicle to make an administrative decision about whether an accused should be retained or separated." *United States v. Ohrt*, 28 M.J. 301, 306 (C.M.A. 1989). Despite this problematic comment, we see no prejudice to Appellant, as this comment was isolated, not repeated, and not part of any running theme or theory in trial counsel's argument. As noted above, the members did not sentence Appellant to a dishonorable discharge, which is strong evidence of the lack of impression the comment left on them.

**D. Trial Counsel's Reading of JC's Unsworn Statement**

JC prepared a written unsworn statement to the court-martial. When the Government rested its sentencing case, trial counsel told the military judge that JC "is offering an unsworn impact statement. And we would propose—the victim has requested that it be read on his behalf. Trial counsel is prepared to read it." The military judge then asked, "Defense, do you have any objections either to the substance or to the manner of presentation?" Trial defense counsel replied, "No, Your Honor. Not at all." Trial counsel proceeded to read the statement to the members.

In JC's statement, he explained that after the assault, he had difficulties sleeping and "felt anxious for quite a while," leading him to remove himself from his duty section in order to work at the base chapel where he was able to receive mental health treatment. JC wrote that he initially "had a hard time forgiving [Appellant] but time heals" and that he did not believe Appellant was "a bad man," but rather "a guy that had some bad things to deal with, but didn't deal with it in a good way." He also wrote that he hoped "the best" for Appellant and that Appellant "heals from the trauma in his life and leans on the help he's received, and hopefully continues to receive in the future." Although JC found Appellant's conduct the night of the assault "completely unacceptable," he characterized Appellant as being "just in a dark place at the time."

Shortly thereafter, the military judge asked the parties their positions on whether JC's written statement would be provided to the members. Trial counsel said they were not making a request to give the members the statement, but they also had no objection to doing so. Trial defense counsel said, "Your Honor, we're fine it if goes back with them." The military judge then asked whether either party was actually requesting that the members be given the statement, and trial defense counsel said, "Your Honor, we would request that it goes back with them," leading the military judge to tell trial counsel to publish the exhibit to the members.

On appeal, Appellant argues it was error for the military judge to allow trial counsel to read JC's statement to the members. Under R.C.M. 1001(c)(5)(A), in effect at the time of Appellant's court-martial (as well as this opinion), "*The crime victim* may make an unsworn statement." (Emphasis added). R.C.M. 1001(c)(5)(B) further provides that if good cause is shown, a military judge may allow *a victim's counsel* to deliver the statement. Appellant, however, waived this issue by virtue of trial defense counsel stating they had no objection "at all" to the manner of presenting the statement after being squarely asked by the military judge. Thus, Appellant intentionally relinquished or abandoned a known right. *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009). When an appellant affirmatively states he or she has no objection to the admission of evidence, the issue is ordinarily waived and his or

her right to complain about its admission on appeal is extinguished.[9] *United States v. Ahern*, 76 M.J. 194, 198 (C.A.A.F. 2017) (citing *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009)). Our assessment that Appellant waived this issue rather than merely forfeited it is bolstered by the fact it was the Defense which asked for the written version of JC's statement to be given to the members. This is a strong indication Appellant wanted JC's statement before the members, regardless of form or delivery.

The CAAF has made clear that the Courts of Criminal Appeals have discretion, in the exercise of their authority under Article 66, UCMJ, 10 U.S.C. § 866, to determine whether to apply waiver or to pierce that waiver in order to correct a legal error. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); *United States v. Chin*, 75 M.J. 220, 222–23 (C.A.A.F. 2016) (discussing our ability to correct error despite waiver). We decline to pierce Appellant's waiver, in large part due to the fact JC's statement was conciliatory in tone and dovetailed with the Defense's general theme—that is, that Appellant was not inherently criminal, but rather someone whose life had been derailed by alcohol addiction.

### E. Lesser Included Offense of Simple Assault

Appellant was charged with committing aggravated assault with a dangerous weapon when he pointed his gun at JC. As charged, this offense required the Government to prove, *inter alia*, that Appellant had pointed a loaded firearm at JC with the intent to do bodily harm to JC. The military judge instructed the members on the elements of this offense and also advised the members that simple assault was a lesser included offense, the elements of which included Appellant offering to do bodily harm to JC by unlawfully pointing a firearm at him "with force or violence." Further, the military judge explained that an offer to do bodily harm is "a demonstration of violence . . . which created in the mind of the victim a reasonable apprehension of receiving immediate bodily harm," and that the combination of threatening words and a menacing act or gesture constitutes a demonstration of violence. Finally, the military judge told the members the defense of voluntary intoxication applied to the aggravated assault charge if Appellant's intoxication created reasonable doubt as to Appellant's intent, but that no such defense was available for the lesser included offense of simple assault.

Early in Appellant's court-martial, before the members had been called, the military judge noted on the record that the parties had agreed that simple assault was potentially a lesser included offense of the aggravated assault

---

[9] Victim unsworn statements are not evidence, but we see no reason to apply a different standard of waiver.

charge, but that they would discuss the matter further when it came time to prepare instructions. After the Defense rested, the military judge discussed his proposed instructions with the parties and then recessed the court-martial in order to finalize those instructions. Once back on the record, the military judge said, "Over the break I got emails from both parties indicating that they didn't have objections or additional input for either the findings worksheet or the findings instructions. Is that still the parties' positions?" Trial counsel answered, "That's correct, Your Honor," and trial defense counsel answered, "Yes, Your Honor." After the military judge read his instructions to the members, he asked whether counsel objected to the instructions he had given or requested additional instructions. Trial counsel and trial defense counsel both replied, "No, Your Honor."

Appellant argues the military judge committed plain error by instructing the members on the lesser included offense of simple assault. His premise is that because he was intoxicated at the time, the evidence did not raise that offense. He bases this theory on *United States v. Bean*, 62 M.J. 264 (C.A.A.F. 2005). *Bean*, however, is not analogous to Appellant's case because *Bean* involved an earlier formulation of Article 128, UCMJ. In *Bean*, the appellant had drunkenly threatened others with a knife and then with a loaded gun, although there was dispute over whether the gun's safety was engaged or not. Under the version of Article 128, UCMJ, in effect at the time, a conviction of aggravated assault required proof that, *inter alia*, the assault was carried out in a manner likely to produce death or grievous bodily harm. *See Manual for Courts-Martial, United States* (2000 ed.), ¶ 54.b.(4)(a). The CAAF held that because the appellant had threatened others with a loaded firearm, simple assault was not reasonably raised, regardless of whether the safety was engaged. *Bean*, 62 M.J. at 267. The current version of Article 128, UCMJ, omits the "manner" element and includes a new element requiring the specific intent to do bodily harm. *See Manual for Courts-Martial, United States* (2019 ed.), ¶ 77.b.(4)(a). Given Appellant's level of intoxication, in addition to the wholly circumstantial evidence of his intent at the time he pulled out his gun, the specific-intent element was at issue, giving rise to the lesser included offense of simple assault which does not include the element.

Moreover, Appellant waived this issue when his trial defense counsel stated the Defense had no objections to the instructions, which included the lesser included offense instruction. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (concluding that when an accused states he or she has no objection to a military judge's instructions, such amounts to "expressly and unequivocally acquiescing" to those instructions, thereby waiving any error for appeal); *but see United States v. Schmidt*, 82 M.J. 68, 72–73 (C.A.A.F. 2022) (finding no waiver where there is a new rule of law and the law is unsettled on the

point in issue). We will not pierce Appellant's waiver, primarily due to his failure to advance a colorable theory of a legal error.

## F. Sentence Severity

Appellant contends his sentence is inappropriately severe. In the Government's sentencing case, trial counsel elicited testimony about the restaurant incident and how the assault on JC impacted not only JC himself, but JC's unit. Appellant, meanwhile, introduced character letters as well as documents related to his inpatient treatment indicating he had taken responsibility for his conduct and was remorseful for what he had done. In his unsworn statement, Appellant told the members about being raised by his alcoholic mother until he and his brothers moved in with their father in Colorado. Appellant said he turned to alcohol as a coping mechanism when his older brother committed suicide in 2016. Appellant also described his duties during his deployment which involved plotting and watching "hundreds of kills" as well as "oversee[ing] the sorting of bodies and body parts." In rebuttal to the suggestion that Appellant had taken responsibility while he was in treatment at Denver Springs, the Government admitted a portion of one of Appellant's prison phone calls in which Appellant demeaned JC.

After the military judge merged the assault and drunk and disorderly offenses for sentencing purposes pursuant to a defense motion, he instructed the members that Appellant faced a maximum sentence of a dishonorable discharge, reduction to the grade of E-1, forfeiture of all pay and allowances, a reprimand, and confinement for 18 months. Instead of a dishonorable discharge as trial counsel recommended, the members sentenced Appellant to a bad-conduct discharge; the members also declined to sentence Appellant to be reprimanded.[10] Otherwise, Appellant received the maximum authorized punishment identified by the military judge.

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citation omitted). Our authority to determine sentence appropriateness "reflects the unique history and attributes of the military justice system, [and] includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10

---

[10] When the military judge initially advised the members of the maximum punishment, he omitted the possibility of a reprimand. However, later in his instructions, the military judge told the members a reprimand was an option, and such an option appeared on the members' sentencing worksheet. Trial counsel did not recommend the members sentence Appellant to a reprimand.

U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

On appeal, Appellant concedes "[t]he nature and seriousness of the offenses are not minimal or insignificant," but argues his duty performance, personal tragedies, mental health issues, alcoholism, and remorsefulness render his sentence inappropriately severe, and he asks us to set aside his punitive discharge. The justifications raised by Appellant amount to a request for clemency, which we have no authority to grant. We are also mindful that Appellant pulled a loaded firearm on a fellow Airman while intoxicated, creating the risk of grave injury or death, and that this was not Appellant's first time carrying a concealed firearm while drunk. We have carefully considered Appellant, his record of service, his personal circumstances, and the entirety of his record of trial, and we conclude Appellant's adjudged sentence is not inappropriately severe.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court